1
2
3
4
5
6
7

8        UNITED STATES DISTRICT COURT

9        SOUTHERN DISTRICT OF CALIFORNIA

10

11  JAMES CRAIG DARLING,                    )    Case No. 09-CV-0817-BEN (JMA)
                                            )
12              Petitioner,                 )    **REPORT AND RECOMMENDATION**
                                            )    **RE DENYING PETITION FOR WRIT OF**
13  v.                                      )    **HABEAS CORPUS [Doc. 1] AND**
                                            )    **DENYING REQUESTS FOR STAY**
14  MATTHEW CATE, Secretary of the          )    **AND ABEYANCE [Docs. 15, 20]**
    California Department of Corrections and )
15  Rehabilitation,                         )
                                            )
16              Respondent.                 )
                                            )
17  _____)

18

19  I.      **Introduction**

20          Petitioner James Craig Darling ("Petitioner"), a state prisoner proceeding pro se,

21  has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  On April

22  20, 2005, Petitioner was convicted by jury in San Diego Superior Court case number

23  SCN178962 for assault with a semi-automatic firearm (Cal. Penal Code § 245(b)),

24  shooting at an inhabited occupied structure (id., § 246), discharging a firearm from a

25  motor vehicle at a person (id., § 12034(c)), assault on a peace officer with a semi-

26  automatic firearm (id., § 245(d)(2)), and reckless driving while evading an officer (Cal.

27  Veh. Code § 2800.2).  (Lodgment No. 1, Clerk's Transcript ("CT") at 1-4, 199-200.)

28  Petitioner contends (1) there was insufficient evidence to support the conviction for

assault with a semi-automatic firearm and the related sentence enhancement based on

personal use of a firearm, (2) there was insufficient evidence to support the conviction

for assault on a peace officer with a semi-automatic firearm and the related sentence

enhancement based on personal use of a firearm, and (3) his trial counsel, Sloan

Ostbye, was constitutionally ineffective in representing him.  (See Pet. at 6-9.)

The Court has considered the Petition, Respondent's Answer and Memorandum

of Points and Authorities, Petitioner's Traverse, and all the supporting documents

submitted by the parties.  Based upon the documents and evidence presented in this

case, and for the reasons set forth below, the Court recommends that the Petition be

**DENIED**, and that Petitioner's requests for stay and abeyance be **DENIED**.

**II.     Factual Background**

The following statement of facts is taken from the California Court of Appeal

opinion, People v. James Craig Darling, No. D047251, slip op. (Cal. Ct. App. Nov. 13,

2007).  (Lodgment No. 12.)  This Court gives deference to state court findings of fact

and presumes them to be correct.  Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir.

2008).  Petitioner may rebut the presumption of correctness, but only by clear and

convincing evidence.  Id.; see also 28 U.S.C. § 2254(e)(1).  The facts as found by the

state appellate court are as follows:

*Prosecution Case*

Darling lived in his van, which he parked in a garage across the alley from
a house occupied by Gary Murphy and his 18-year-old son, Kyle.  Darling
and the Murphys had been neighbors and friends for many years.

During the early morning hours on May 21, 2004, Kyle was sleeping in the
Murphys' garage, which had been converted to serve as Kyle's bedroom,
when he was awakened by the sound of two loud bangs and shattering
glass.  Gary also heard the bangs, and when he got up to investigate he
heard someone say, "That was a gun.  That was in the alley."  Gary went
outside to check on Kyle, heard an engine noise, and saw Darling's van
moving slowly down the alley.  The van stopped in front of the Murphys'
garage and, when Gary started to approach the van, he heard Darling yell,
"In the house.  Stand down."  Gary hesitated but, because he thought
Darling was yelling at someone else, he again started toward Darling's
van.  Darling then fired two more shots at Murphy's house, and Gary
retreated.  Gary and Kyle went inside to the safety of the house and called
911.  After police arrived, Kyle went to the garage with an officer and saw
that one of the bullets had left a hole just inches from where he had been

sleeping.  A bullet fired by Darling had passed through the tailgate of Kyle's truck and was found in the truck bed.

Deputy Sheriff Anderson was on patrol when he heard the dispatch report that gunshots had been fired.  He responded and observed Darling's van weaving down the center of the road.  [Anderson] was unsure whether this was the van involved in the shooting but stopped the van for suspected drunk driving.

Anderson felt something was amiss and therefore pulled his handgun from his holster and held it in the "low ready position" as he approached the van.  When he reached the van, Anderson (holding his gun above the roof so that Darling could not see it) asked Darling for his license and registration.  Darling's left hand was on the steering wheel in full view but, because Anderson could not see his right hand, Anderson told Darling several times to put his hands on the steering wheel.  Each time, Darling responded by mumbling an incoherent response about "Coast Guard" or "Navy SEAL."

Darling then looked at Anderson and began to lift his right arm up.  Anderson saw Darling was holding a Colt .45 handgun and was swinging it to point at Anderson; the barrel came within six to 10 inches of Anderson's face.  Anderson pushed away from the van, stumbled backwards, and fired numerous rounds at the van's door to prevent Darling from getting out of the van.  Darling then drove away.

Anderson pursued the van.  Darling obeyed the speed limits but, when Anderson neared the van, Darling suddenly put the van into reverse and rammed backwards into Anderson's car, causing the front of the patrol car to crumple and the air bag to deploy.  Darling then drove away.  However, Anderson's car was not incapacitated and he was able to pursue Darling.  Other officers responded to Anderson's call for help and also pursued Darling.  When Darling eventually came to a stop, police were able to subdue and handcuff him.

Police found a loaded semiautomatic handgun in Darling's van, along with additional fully loaded magazines.  Ballistics analysis of a bullet recovered near the Murphys' home confirmed Darling's weapon had fired the shot, and other bullets recovered from the scene were consistent with having been fired from Darling's weapon.

*Darling's Testimony*

Darling testified he had fallen asleep after drinking a pint of bourbon and was awakened by gunshots.  He drove around to investigate, carrying his gun for protection.  When he was driving down the alley near the Murphy house he saw a muzzle flash and thought someone was shooting at him.  He responded by firing one shot into the gravel and yelling at anyone inside the Murphy house to "stand down."  Because he had no telephone, he drove to Leucadia Boulevard to find a public telephone.  As he was driving, he saw a police car and started weaving to attract its attention.  When he realized the deputy wanted him to pull over, he stopped the van.  The deputy approached him, yelling repeatedly, "Do you have a gun?" and he responded by reaching down and retrieving the pistol.  He held it up for the deputy to see, but did not point it at the deputy.  The deputy then started firing at Darling, so Darling ducked down until the shooting

3

09cv0817

1    stopped, at which point he drove away.

2    Darling saw the deputy following him.  He wanted to find a witness or a
     telephone, so he rammed the patrol car to trigger the air bag to stop the
3    deputy from following him.  He then drove away, hoping to find a witness
     or a place he could safely stop.  Although Darling saw additional officers
4    pursuing him, he still feared the first officer would shoot him, so he
     continued driving to find a place with witnesses so he could safely
5    surrender.  He eventually stopped at a taco shop where witnesses were
     present.  He tried to comply with the officers' demands to get down but his
6    injured knee prevented him from kneeling, and the officers then knocked
     him down.

7
     The casings found in the van were his because he collected them at
8    shooting ranges to reuse them.  He did not intend to injure the Murphys.

9    (Lodgment No. 12 at 2-5.)

10   **III.    Procedural Background**

11        On July 7, 2004, the District Attorney for the County of San Diego (the "DA") filed

12   an Information charging Petitioner with five felony counts relating to the above incidents.

13   (Lodgment No. 1, Supp. Clerk's Transcript at 1-3.)  On April 6, 2005, the DA filed an

14   Amended Information charging Plaintiff with seven felony counts, including attempted

15   murder (count 1), assault with a semi-automatic firearm (count 2), shooting at an

16   inhabited occupied structure (count 3), discharge of a firearm from a motor vehicle

17   (count 4), assault of a peace officer with a semi-automatic firearm (count 5), assault with

18   a deadly weapon on a peace officer (count 6), and evading an officer with reckless

19   driving (count 7).  (CT at 1-4.)  On April 20, 2005, a jury found Petitioner guilty on counts

20   2, 3, 4, 5, and 7, and not guilty on counts 1 and 6.  (Id. at 199-200.)  The jury also found

21   true allegations of personal use of a firearm, a handgun, during the commission of the

22   offenses set forth in counts 2 and 5.  (Id.)  Petitioner was sentenced on September 26,

23   2005 to 11 years in state prison, which included a 4 year enhancement on the two use

24   of firearm findings (Cal. Penal Code § 12022.5).  (CT at 168.)

25        Petitioner appealed to the California Court of Appeal, Fourth Appellate District,

26   Division One ("California Court of Appeal").  (Lodgment Nos. 3-6.)  On October 26,

27   2006, in an unpublished opinion, the California Court of Appeal reversed the conviction

28   on count 2, but affirmed the judgment in all other respects.  (Lodgment No. 7.)  On

09cv0817

November 30, 2006 and December 4, 2006, the People of the State of California ("the People") and Petitioner, respectively, each filed Petitions for Review in the California Supreme Court.  (Lodgment Nos. 8, 9.)  On February 14, 2007, the California Supreme Court ordered that further action on the People's petition was deferred pending disposition of a related issue in People v. Licas.  (Lodgment No. 11.)  That same day, the California Supreme Court denied Petitioner's petition for review without citation of authority.  (Id.)  On October 10, 2007, the California Supreme Court transferred the matter to the California Court of Appeal with directions to vacate its decision and to reconsider the cause in light of the decision issued in People v. Licas, 41 Cal. 4th 362 (2007).  (Lodgment Nos. 10, 11.)  On November 9, 2007, the California Court of Appeal vacated its October 26, 2006 opinion and affirmed the trial court judgment in full. (Lodgment No. 12.)  On July 10, 2008, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which denied the petition on December 17, 2008 without citation of authority.  (Lodgment Nos. 13, 14.)

On April 15, 2009, Petitioner filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court.  (Doc. 1.)  Respondent filed an Answer on July 10, 2009.  (Doc. 8.)  On October 29, 2009, Petitioner filed a "Request for Stay and Abeyance." (Doc. 15.)  Respondent filed an opposition to Petitioner's request for stay and abeyance on November 16, 2009.  (Doc. 18.)  Petitioner then filed a virtually identical "Request for Stay and Abeyance" on November 20, 2009.  (Doc. 20.) Petitioner filed an untimely Traverse on March 22, 2010.  (Doc. 22.)

**IV.    Discussion**

    **A.    Standard of Review**

Title 28, United States Code, § 2254(a) sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

The current Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320 (1997).  As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000); see also Lockyer v. Andrade, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision.  Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  See Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000) (overruled on other grounds by Lockyer, 538 U.S. at 75-76); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim.  Early v. Packer, 537 U.S. 3, 8 (2002).  "[S]o long as neither the reasoning nor the result of the

1  state-court decision contradicts [Supreme Court precedent]," the state court decision will

2  not be "contrary to" clearly established federal law.  Id.

3      **B.**    **Insufficiency of the Evidence - Assault on Kyle Murphy**

4          Petitioner contends that the evidence was constitutionally insufficient to support

5  his conviction for assault with a semi-automatic firearm on Kyle Murphy and the related

6  sentence enhancement based on personal use of a firearm.  He contends the elements

7  of assault with a deadly weapon were not present as Kyle "saw no assault, no assault

8  was launched upon him, [ ] he sustained no injury[, and] [d]uring the event, [he] rolled

9  over in bed and went back to sleep."  (Pet. at 6.)  Petitioner also maintains there was no

10 proven use of a firearm in the record in that the San Diego County Sheriff's Department

11 Firearms Analysis Unit found no bullet match to his firearm and there was no positive

12 gun shot residue test.  (Id.)  Petitioner raised this claim for the first time in the California

13 Supreme Court on collateral review (see Lodgment No. 13 at Ground 1) and, arguably,

14 on direct review (see Lodgment No. 9).  The California Supreme Court denied both the

15 petition for review and the petition for writ of habeas corpus without comment.

16 (Lodgment Nos. 11, 14.)  Because the California Supreme Court did not furnish a basis

17 for its reasoning, this Court must conduct an independent review of the record to

18 determine whether the state court's decision is contrary to, or an unreasonable

19 application of, clearly established Supreme Court law.  See Delgado, 223 F.3d at 982.

20         The Fourteenth Amendment's Due Process Clause is violated "if it is found that

21 upon the evidence adduced at the trial no rational trier of fact could have found proof of

22 guilt beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 324 (1979).  In

23 deciding whether a due process violation has occurred, this Court must look to "the

24 substantive elements of the criminal offense as defined by state law."  Id. at 324 n.16.

25 Under California law, an assault is defined as "an unlawful attempt, coupled with a

26 present ability, to commit a violent injury on the person of another."  Cal. Penal Code

27 § 240.  In order to prove an assault, each of the following elements must be proved:

28         1.    A person willfully [and unlawfully] committed an act which by its
                 nature would probably and directly result in the application of

1    physical force on another person;

2    2.    The person committing the act was aware of facts that would lead a
3          reasonable person to realize that as a direct, natural and probable result
      of this act that physical force would be applied to another person; and

4    3.    At the time the act was committed, the person committing the act had the
      present ability to apply physical force to the person of another.

5

6    (CALJIC No. 9.00; CT at 51.)  Assault with a semi-automatic firearm, the charge at

7    issue here, is simply an assault committed with a semi-automatic firearm.  (Cal. Penal

8    Code § 245(b); CALJIC 9.02.1; CT at 50.)  The focus on an assault charge is "on the

9    actions of the defendant."  People v. Griggs, 216 Cal. App. 3d 734, 742 (1989).  "The

10   victim's fear, lack of fear, injury, or lack of injury are not elements which need to be

11   proved or disproved."  Id.  "[I]t is not the subjective belief of the victim which is

12   determinative, but whether the person charged with the assault had the present ability

13   to commit a violent injury."  People v. Mosqueda, 5. Cal. App. 3d 540, 544 (1970)

14   (quotations omitted).  In addition, "[A]ny person who personally uses a firearm in the

15   commission of a felony or attempted felony shall be punished by an additional and

16   consecutive term of imprisonment in the state prison for 3, 4, or 10 years."  Cal. Penal

17   Code § 12022.5(a).  "The term 'personally used a firearm' . . . means that the defendant

18   must have intentionally displayed a firearm in a menacing manner, intentionally fired it,

19   or intentionally struck or hit a human being with it."  (CALJIC No. 17.19; CT at 78.)

20        An independent review of the record of Petitioner's trial reveals that the state

21   court's denial of Petitioner's claim was not contrary to, or an unreasonable application

22   of, Jackson in light of California law.  At trial, the prosecution presented the following

23   evidence that Petitioner committed assault with a semi-automatic firearm on Kyle

24   Murphy and personally used a firearm in the commission of that crime:

25        On May 21, 2004, Kerry Calver woke up around 1:07 or 2:07 a.m. to noises that

26   sounded like gunshots.  She looked out the window and saw a blue van sitting at the

27   end of the street.  Approximately seven minutes later, she heard commotion and yelling

28   and went back to the window.  She saw the same van driving very slowly down the

alleyway in the opposite direction as before.  The van drove slowly near where Mr. Murphy, who lived next door, was standing.  Approximately a minute after she heard the yelling, she heard a second set of gunfire and glass shattering.  Ms. Calver had previously seen the blue van parked in a parking garage under Dr. Schubert's facility, located near her residence.  (Lodgment No. 2, Reporter's Transcript ("RT") Vol. 3 at 92-99.)

Gary Murphy was awakened by three loud "booms" after midnight on May 21, 2004.  He looked out his window and heard someone say, "That was a gun.  That was in the alley."  Mr. Murphy went outside to check on his son, Kyle.  Mr. Murphy heard an engine noise coming slowly down the alley.  He waited at his gate and finally saw the white roof of Petitioner's van.  He had seen Petitioner's van pull in many times.  Mr. Murphy went out to talk to Petitioner as he did not know if Petitioner knew about the gunshots.  Petitioner yelled, "In the house.  Stand down" twice.  Mr. Murphy thought that Petitioner perhaps had someone cornered under the garage, so he stepped forward. Petitioner then fired two shots toward Murphy's house.  As Mr. Murphy retreated back to his house, Kyle came out of his bedroom and asked, "Dad, what's going on?"  Mr. Murphy responded, "I think Jim's trying to shoot us."  (RT Vol. 4 at 242-56.)  Mr. Murphy had known Petitioner for a long time, and stated that Petitioner maintained a garage and lived in his van, which he parked near Dr. Schubert's office, near the Murphy residence. (Id. at 235-37.)

Kyle Murphy testified that two or three weeks prior to the shooting incident, Petitioner stopped by his house and saw that Kyle had his bedroom in the converted garage.  Kyle had no personal gripe with Petitioner, and stated that they had always been friends and had always been close.  (Id. at 140-46.)  According to Kyle, one of the bullet holes in the garage was located just inches above where he slept.  (Id. at 133-34.) Dr. Keith Schubert, a dentist, testified that he and Petitioner took a car ride together on May 19, 2004, at which time Petitioner said, "Gary hates me" and "I don't know what I have done to make Gary angry, but he hates me."  (RT Vol. 7 at 627-28.)

09cv0817

Deputy Sheriff Robert Stevenson searched Petitioner's van about an hour after he was taken into custody and saw shell casings, a bullet, and a gun.  (RT Vol. 4 at 285.)  Deputy Sheriff Ray T. Anderson was sent to the location of the van to render the gun safe.  He found the gun, a Norinco .45 caliber semi-automatic, with a round in the chamber and ready to fire.  (Id. at 340-44.)  Anthony DeMaria, a supervising criminalist for the San Diego Sheriff's Crime Lab, testified that six bullets hit the Murphy property, including two strikes on the garage.  (Id. at 378, 385.)  A projectile that had been shot at the Murphys' Chevy pickup was positively identified as having been fired from Petitioner's gun.  Two bullets recovered near the Murphys' Chevy Suburban had class characteristics indicating they could have been fired from Petitioner's gun, but did not contain enough detail for a positive identification.  Two other recovered bullets were too damaged and thus were not usable for analysis, and a sixth bullet, which had gone through the garage, could not be found.  (Id. at 368-84.)  Five casings recovered from the inside of Petitioner's van were identified as having been fired through Petitioner's pistol.  For the casings to have been found where they were, on the van's floorboard, it was most likely that the firearm was fired from inside the van.  (Id. at 389-93.)  Criminalist DeMaria also testified that the effectiveness of a gun shot residue test can be diluted if there is a lot of contact between one's hands and other surfaces after a gun has been fired.  (Id. at 398-99.)

The evidence was plainly sufficient to support Petitioner's conviction for assault with a semi-automatic firearm on Kyle Murphy.  The evidence showed that Petitioner made an unlawful attempt, and had the present ability, to commit a violent injury using a semi-automatic firearm upon Kyle Murphy.  Petitioner was driving his van in the alley at the time gunshots were fired.  Gary Murphy saw Petitioner fire two shots at his home.  Petitioner knew that Kyle had his bedroom in the garage.  Two of the shots went through the garage, one of which came within inches of where Kyle was sleeping.  Of the six bullets which hit the Murphy property, one was positively identified as having been fired from Petitioner's gun and two had class characteristics indicating they could

have been fired from his gun.  Five casings were recovered from the inside of

Petitioner's van and were identified as having been fired through Petitioner's pistol from

inside the van.  Petitioner's loaded gun was recovered from his van.  Clearly, a rational

trier of fact could have found beyond a reasonable doubt that Petitioner committed the

crime.  See Jackson, 443 U.S. at 324.

It is not significant that Kyle was not, as Petitioner argues, aware of the assault at

the time it occurred or that he was not injured.  See Griggs, 216 Cal. App. 3d at 742;

Mosqueda, 5. Cal. App. 3d at 544.  Petitioner's argument that there was no proven use

of a firearm against Kyle is belied by the evidence set forth above.  That Petitioner

apparently did not test positive for gun shot residue does not negate the other evidence

against him, particularly given Criminalist DeMaria's testimony about the dilution of the

effectiveness of such a test after there has been contact between the hands and other

surfaces after a gun has been fired.

In light of California law, and given the record at trial, a rational trier of fact could

have found proof that Petitioner committed assault with a semi-automatic firearm on

Kyle Murphy, and personally used a firearm in the commission thereof, beyond a

reasonable doubt.  Thus, the California Supreme Court reasonably applied the Jackson

standard in denying Petitioner's claim.  Accordingly, Petitioner was not denied due

process, and the claim should be denied.

**C.**     **Insufficiency of the Evidence - Assault on Deputy Anderson**

Petitioner also contends that the evidence was constitutionally insufficient to

support his conviction for assault on Deputy Anderson with a semi-automatic firearm or

the related sentence enhancement based on personal use of a firearm.  He contends

that "mere presence of a firearm is not a component of assault," and that Deputy

Anderson's testimony concerning his view of Petitioner's pistol did not support an

assaultive intent on Petitioner's part but rather a "passive display" of the firearm.  (Pet.

at 7.)  Petitioner raised this claim before the California Supreme Court on collateral

review (see Lodgment No. 13 at Ground 2) and, arguably, on direct review  (see

Lodgment No. 9).  The California Supreme Court denied both the petition for review and the petition for writ of habeas corpus without comment.  (Lodgment Nos. 11, 14.) Because the California Supreme Court did not furnish a basis for its reasoning, this Court must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  See Delgado, 223 F.3d at 982.

An independent review of the record of Petitioner's trial reveals that the state court's denial of Petitioner's claim was not contrary to, or an unreasonable application of, Jackson in light of California law.  At trial, the prosecution presented the following evidence that Petitioner committed assault with a semi-automatic firearm on Deputy Anderson and personally used a firearm in the commission of that crime:

Toward the end of his 6:00 p.m. to 2:30 a.m. shift on May 21, 2004, Deputy Anderson received a call for shots fired in the area.  According to the call, the shooting involved a white van.  Deputy Anderson observed a blue van with a white top approaching the intersection of Leucadia and Highway 101, also known as Pacific Coast Highway.  After the van made a right turn onto Highway 101, Deputy Anderson observed that it was weaving, or drifting from side to side, as it traveled.  Deputy Anderson decided to pull over the van for drunk driving.  As he approached the van from the rear driver's side, Deputy Anderson got a "funny" feeling that something wasn't right, so he pulled his handgun out and held it in his right hand.  When he arrived at Petitioner's door window, he held his right arm up and rested it against the door so as to keep it out of Petitioner's sight.  He was holding his flashlight in his left hand and was leaning slightly with his head into the driver's door window.  Deputy Anderson believes he asked Petitioner for his license, registration, and proof of insurance, as he typically does on a traffic stop.  He attempted to make eye contact with Petitioner, but Petitioner would not look at him.  Deputy Anderson could see Petitioner's left hand on the steering wheel, but could not see his right arm at all.  Deputy Anderson told Petitioner between three and five times, "Put your hand on the steering wheel."  Petitioner mumbled

something about "Coast Guard" and "Navy Seal" and kept looking straight ahead. Petitioner then looked at Deputy Anderson.  Simultaneously, Deputy Anderson could see Petitioner's arm coming up and recognized the brown grips and blue steel color of a Colt .45 handgun.  Deputy Anderson saw the barrel of the gun coming toward him. Deputy Anderson's face was two to three inches inside the van at about the same height as Petitioner's shoulder.  The barrel of Petitioner's gun came about six to ten inches from his face.  Deputy Anderson immediately pushed off from Petitioner's van and fired his own gun into the window of the van to suppress gunfire by Petitioner. Deputy Anderson shot about thirteen rounds, and then the van started to leave.  Deputy Anderson shot two more rounds into the back end of the van.  (RT Vol. 3 at 155-75.) Petitioner did not fire a shot at either Deputy Anderson or his vehicle.  (Id. at 215.) Deputy Anderson testified that at the time he pulled the van over, he did not think it was the same van that had been involved in the shooting.  (Id. at 207.)  He stated that he would not have approached the vehicle nor put his head into the window of the van if he had believed Petitioner was the shooter.  (Id. at 223.)

After Petitioner was taken into custody, Deputy Sheriff Stevenson searched Petitioner's van and found a gun on the floorboard between the driver's seat and the front passenger seat.  (RT Vol. 4 at 284-87.)  Deputy Sheriff Ray T. Anderson, who was sent to the location of the van to render the gun safe, found the gun, a Norinco .45 caliber semi-automatic, with a round in the chamber and ready to fire.  (Id. at 340-44.)[1]

Again, assault with a semi-automatic firearm is defined under California law as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another," committed with a semi-automatic firearm.  Cal. Penal Code §§ 240, 245(b).  A person commits assault with a semi-automatic firearm upon a peace officer when the person "knows or reasonably should know that the victim is a peace officer . . . engaged in the performance of his or her duties, when the peace officer . . . is engaged

---

[1]  According to Deputy Ray T. Anderson's testimony, a Norinco .45 caliber, which is made in China, is a copy of the American Colt .45 automatic.  (RT Vol. 4 at 341-42.)

1   in the performance of his or her duties." Cal. Penal Code § 245(d)(2).  Here, the

2   evidence was sufficient to support Petitioner's conviction for assault with a semi-

3   automatic firearm on Deputy Anderson, a peace officer.  The evidence showed that

4   Petitioner made an unlawful attempt, and had the present ability, to commit a violent

5   injury using a semi-automatic firearm upon Deputy Anderson.  Petitioner kept his right

6   arm and hand from view after being pulled over by Deputy Anderson.  He did not

7   comply with Deputy Anderson's request for his license, registration, and proof of

8   insurance, did not look at Deputy Anderson, did not speak to Anderson, mumbled

9   incoherently, and did not immediately comply with Deputy Anderson's request to place

10  his right hand on the steering wheel.  When he did finally show his right extremity, it was

11  with a gun in hand.  Although the evidence at trial showed that Petitioner did not fire a

12  shot at Deputy Anderson, this is not a necessary element of either the crime or the

13  personal use of firearm enhancement.  See, e.g., People v. Fain, 34 Cal. 3d 350, 356-

14  57 & n.6 (1983) (providing that assault with a firearm does not require actual discharge

15  of the weapon); CALJIC 17.19 ("Personal use of a firearm" includes not only the

16  intentional firing of a firearm but also the intentional display of a firearm in a menacing

17  manner and the intentional striking or hitting a human being with a firearm.).  It was

18  reasonable for the jury to infer that Petitioner was about to shoot Deputy Anderson, and

19  was deterred only by Deputy Anderson's suppression fire.  Under these circumstances,

20  a rational trier of fact could have found beyond a reasonable doubt that Petitioner

21  committed the crime.  See Jackson, 443 U.S. at 324.

22       In light of California law, and given the record at trial, a rational trier of fact could

23  have found proof that Petitioner committed assault with a semi-automatic firearm on a

24  peace officer, Deputy Anderson, and personally used a firearm in the commission

25  thereof, beyond a reasonable doubt.  Thus, the California Supreme Court reasonably

26  applied the Jackson standard in denying Petitioner's claim.  Accordingly, Petitioner was

27  not denied due process, and the claim should be denied.

28  //

### D.   Ineffective Assistance of Counsel

Petitioner contends his trial counsel, Sloan Ostbye, rendered him ineffective assistance in the following respects:  In relation to a Marsden issue; by failing to file a charge of excessive force against Deputy Anderson; by failing to file a Pitchess motion in relation to Deputy Anderson; by failing to utilize a defense investigator; by failing to retain a firearm expert; by failing to present the Firearms Analysis Unit Report; and through cumulative prejudicial performance.  (Pet. at 8-9).

Under clearly established U.S. Supreme Court law, to establish ineffective assistance of counsel, Petitioner must show that: (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).  The Court must review counsel's performance deferentially.  Additionally, a wide measure of deference must be given to counsel's tactical decisions.  Indeed, Strickland notes that "counsel's tactical decisions are virtually unchallengeable."  Strickland, 466 U.S. at 690; see also Furman v. Wood, 190 F.3d 1002, 1007 (9th Cir. 1999).  A petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Strickland, 466 U.S. at 689 (citations omitted).

### 1.   *Marsden* Issue

Petitioner contends that as of the Marsden hearing held on November 5, 2004, an irreconcilable conflict existed between himself and his trial counsel due to counsel's failure to communicate with him.  (Pet. at 8.)  He contends the denial of his Marsden motion deprived him "of the right to counsel of choice."  (Id.)  Petitioner raised this ineffective assistance of counsel claim for the first time in the California Supreme Court on collateral review.  (Lodgment No. 13 at Ground 3.)  That court denied the petition without comment.  (Lodgment No. 14.)  Because the California Supreme Court did not furnish a basis for its reasoning, this Court must conduct an independent review of the

1   record to determine whether the state court's decision is contrary to, or an unreasonable

2   application of, clearly established Supreme Court law.  See Delgado, 223 F.3d at 982.

3          The term "Marsden motion" comes from People v. Marsden, 2 Cal. 3d 118

4   (1970), a California Supreme Court case which held that as part of a criminal

5   defendant's right to effective assistance of counsel under the Sixth Amendment, a trial

6   judge must permit a defendant requesting substitute counsel the opportunity to present

7   his reasons for the request, i.e., evidence and argument to establish that he is receiving

8   ineffective assistance of counsel.  See Robinson v. Kramer, 588 F.3d 1212, 1215 n.2

9   (9th Cir. 2009).  A Marsden motion hearing was held in Petitioner's case on November

10  5, 2004.  (Pet. at 8; CT at 179-80.)  The motion was denied.  (CT at 180.)

11         It is not entirely clear to the Court exactly how the denial of Petitioner's Marsden

12  motion bears upon his ineffective assistance of counsel claim.  It does not appear that

13  Petitioner is attempting to articulate a separate claim that the trial court erred in denying

14  his Marsden motion, as he has consistently couched the Marsden issue as an aspect of

15  his ineffective assistance of counsel claim rather than as a separate claim of trial court

16  error.  (See Lodgment No. 13 at Ground 3; Pet. at 8.)  In addition, Petitioner provides no

17  argument to support a claim of trial court error.  Instead, it appears that Petitioner has

18  raised this Marsden issue to support his ineffective assistance of counsel claim as a

19  whole, that is, to demonstrate that he believed, even prior to trial, that he was receiving

20  constitutionally ineffective assistance from Ms. Ostbye.  It also appears that Petitioner

21  desires to show that Ms. Ostbye was aware of what Petitioner deems to be exculpatory

22  information, including the San Diego County Sheriff's Department Firearms Analysis

23  Report, at the time of the hearing.  (Traverse at 9.)  Thus, the Court construes the

24  Marsden aspect of Petitioner's ineffective assistance of counsel claim not as a separate

25  component of his claim but rather as being subsumed within the remainder of his

26  ineffective assistance of counsel claim.  To the extent Petitioner intends his Marsden

27  issue to serve as a separate basis for his ineffective assistance of counsel claim, the

28  Court recommends that the claim be denied as Petitioner has failed to sufficiently

09cv0817

1    articulate a basis for federal habeas relief.

2                    **2.    Failure to "File a Charge" of Excessive Force**

3           Petitioner contends Ms. Ostbye was constitutionally ineffective because she did

4    not "act to file a charge of excessive force" against Deputy Anderson when the initial

5    arrest record indicated that Deputy Anderson shot at his van sixteen times at point blank

6    range.  (Pet. at 8.)  Respondent observes that this claim is unexhausted.  (Answer at

7    17-18.)  Nonetheless, Respondent argues that this component of Petitioner's ineffective

8    assistance of counsel claim should be denied notwithstanding any failure to exhaust

9    because it clearly lacks merit.  (Id.)

10          The exhaustion of available state remedies is a prerequisite to a federal court's

11   consideration of claims presented in a habeas corpus proceeding.  28 U.S.C. § 2254(b);

12   Rose v. Lundy, 455 U.S. 509, 522 (1982); McQueary v. Blodgett, 924 F.2d 829, 833

13   (9th Cir. 1991).  A habeas petitioner satisfies the exhaustion requirement by providing

14   the state court with a "'fair opportunity' to apply controlling legal principles to the facts

15   bearing upon his constitutional claim."  Anderson v. Harless, 459 U.S. 4, 6 (1982).  A

16   petitioner must present the claim to the highest state court in order to properly exhaust

17   his claim.  Weaver v. Thompson, 197 F.3d 359, 364 (9th Cir. 1999) (citing Picard v.

18   Connor, 404 U.S. 270, 276 (1971)).

19          In this case, Petitioner did present a claim for ineffective assistance of counsel in

20   his petition for writ of habeas corpus filed before the California Supreme Court.

21   (Lodgment No. 13 at Ground 3.)  He did not, however, present this aspect of his claim in

22   the petition.  (See id.)  Each basis of an ineffective assistance of counsel claim must be

23   separately presented in order to be exhausted.  Moormann v. Schriro, 426 F.3d 1044,

24   1056 (9th Cir. 2005).  A petitioner who has presented an ineffective assistance of

25   counsel claim before the state courts cannot later add unrelated alleged instances of

26   counsel's ineffectiveness to his claim.  Id.  Petitioner has thus failed to provide the

27   highest state court a "fair opportunity" to review this component of his claim.  See

28   Weaver, 197 F.3d at 364 (citing Picard, 404 U.S. at 276).  Accordingly, the Court finds

1  this claim is unexhausted.

2          Although this claim is unexhausted, a federal court may nonetheless deny a

3  claim on the merits "where it is perfectly clear that the applicant does not raise even a

4  colorable federal claim." Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir. 2005);

5  see also 28 U.S.C. § 2254(b)(2).  Respondent asserts that Petitioner fails to assert a

6  colorable federal claim because his counsel was a deputy public defender, not a

7  prosecutor, and thus she had no authority to initiate a prosecution against Anderson.

8  (Answer at 18.)  Respondent also argues that there was no need to "charge" Anderson

9  with using excessive force as his trial counsel properly presented the issue of

10  Anderson's use of force through instructions and argument.  (Id.)

11          Respondent has demonstrated that this claim is clearly without merit and without

12  any cognizable federal habeas relief.  That Ms. Ostbye failed to "file a charge" of

13  excessive force against Deputy Anderson does not, and cannot, serve as the basis for a

14  valid ineffective assistance of counsel claim.  Ms. Ostbye, as Petitioner's defense

15  counsel, was under no duty to pursue an affirmative claim against Deputy Anderson on

16  Petitioner's behalf for the use of excessive force.  Thus, it cannot be said that counsel's

17  representation "fell below an objective standard of reasonableness" under Strickland,

18  466 U.S. at 687-88, and the claim should be denied.

19          Moreover, Deputy Anderson's alleged use of excessive force was not relevant to

20  any defense presented by Petitioner at trial for the charges relating to the shooting at

21  the Murphy residence or the assault upon Deputy Anderson as the incidents giving rise

22  to those charges occurred before Deputy Anderson's alleged use of excessive force.

23  Although Deputy Anderson's use of force could conceivably bear upon Petitioner's

24  defense for evading an officer, i.e., that he evaded Anderson and the other deputies

25  because he was afraid of being shot, a thorough review of the record of Petitioner's trial

26  shows that Ms. Ostbye did properly present the issue of Deputy Anderson's allegedly

27  improper use of force through her cross-examination of Deputy Anderson (RT Vol. 3 at

28  211-13) and her direct examination of Petitioner (RT Vol. 6 at 519-24).  Finally, Deputy

Anderson's alleged use of excessive force could not, as Petitioner appears to contend (see Traverse at 10), take Deputy Anderson "outside the scope of his duties" as a peace officer, and thus serve as a defense to the assault on a peace officer charge, because again, the events giving rise to the assault on Deputy Anderson occurred *before* Anderson's alleged use of excessive force.

In sum, Petitioner cannot state a colorable claim for ineffective assistance of counsel on the basis that counsel failed to "file a charge" of excessive force against Deputy Anderson.  Therefore, this aspect of Petitioner's ineffective assistance of counsel should be dismissed. See Cassett, 406 F.3d at 624 (federal court may deny relief on the merits of an unexhausted claim when it is perfectly clear the petitioner has "no chance of obtaining relief"); see also Madsen v. McGrath, 2008 WL 681886, at *1, *7 (S.D. Cal. 2008) (denying unexhausted claim on the merits when it was "perfectly clear" claim was without merit); Bartholomew v. Mendoza-Powers, 2009 WL 1459443, at *1, *6 (S.D. Cal. 2009).

### 3.    Failure to File *Pitchess* Motion

Petitioner next contends his trial counsel rendered constitutionally ineffective assistance of counsel because she failed to file a Pitchess motion to "discover Deputy Anderson's arrest record."  (Pet. at 8.)  Respondent observes that this claim is unexhausted.  (Answer at 19.)  Nonetheless, Respondent argues that this component of Petitioner's ineffective assistance of counsel claim should be denied notwithstanding any failure to exhaust because it clearly lacks merit.  (Id.)

The purpose of a Pitchess motion is to allow a criminal defendant to discover evidence in a peace officer's personnel file that is relevant to the defendant's ability to defend against a criminal charge.  See Pitchess v. Superior Court, 11 Cal. 3d 531 (1974).  Here, Petitioner has failed to demonstrate a reasonable probability that but for counsel's alleged error, the result of the proceedings would have been different.  See, e.g., Osumi v. Giurbino, 445 F. Supp. 2d 1152, 1163 (C.D. Cal. 2006) (finding habeas petitioner's failure to identify evidence that trial counsel would have gleaned by filing

09cv0817

Pitchess motion was "manifestly insufficient to demonstrate a petitioner was in any manner prejudiced by trial counsel not filing a Pitchess motion"). Petitioner's claim thus fails under Strickland and should be denied. See Strickland, 466 U.S. at 694.

### 4. Failure to Use Defense Investigator

Petitioner contends his trial counsel was constitutionally ineffective because she failed to use the services of the appointed defense investigator, Peter Nunez. (Pet. at 8.) Petitioner raised this aspect of his ineffective assistance of counsel claim for the first time in the California Supreme Court on collateral review. (Lodgment No. 13 at Ground 3.) That court denied the petition without comment. (Lodgment No. 14.) Because the California Supreme Court did not furnish a basis for its reasoning, this Court must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. See Delgado, 223 F.3d at 982.

Petitioner provides but one sentence to explain how he believes the defense investigator's services were deficient: "Mr. Nunez never viewed Petitioner's Dodge van, with its bullet holes, nor was he aware of its location in San Diego County." (Traverse at 10.) Petitioner has otherwise failed to specify what the investigator could have done to aid in his defense or how he would have testified and what difference this would have made in the outcome of his case. As such, Petitioner's showing is plainly insufficient to support habeas relief. Strickland, 466 U.S. at 687-88, 694. Presumably, Petitioner believes that had the investigator viewed his van and the bullet holes it contained, there would have been further support for his argument that Deputy Anderson used excessive force against him. As discussed above, however, any alleged use of excessive force by Deputy Anderson occurred *after* 4 of the 5 crimes for which Petitioner was convicted. Moreover, the trial record already contains testimony relating to the bullets shot into Petitioner's van. (See RT Vol. 4 at 354-58 (DeMaria testimony); RT Vol. 3 at 174-75 (Anderson testimony); and RT Vol. 6 at 560-61 (Petitioner testimony).) Mr. Nunez's observations and testimony on this point were simply not necessary. Thus, it cannot be

said that Ms. Ostbye's representation fell below an objective standard of reasonableness for not having Mr. Nunez view Petitioner's van, or that the result of the proceeding would have been different had he done so.  Strickland, 466 U.S. at 687-88, 694.  The Court accordingly finds that the California Supreme Court's denial of Petitioner's claim was not contrary to or an unreasonable application of Strickland, and the claim should be denied.

**5.    Failure to Retain Firearm Expert**

Petitioner next contends his trial counsel was constitutionally ineffective because she failed to engage the services of a firearm expert to examine the bullet claimed to have been shot from Petitioner's pistol.  (Pet. at 8.)  Petitioner raised this aspect of his ineffective assistance of counsel claim for the first time in the California Supreme Court on collateral review.  (Lodgment No. 13 at Ground 3.)  That court denied the petition without comment.  (Lodgment No. 14.)  Because the California Supreme Court did not furnish a basis for its reasoning, this Court must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  See Delgado, 223 F.3d at 982.

Petitioner was convicted, in relation to the shooting at the Murphy residence, in part because of the testimony of Criminalist DeMaria, who testified that a projectile that had been found at the residence was positively identified as having been fired from Petitioner's gun.  (RT Vol. 4 at 369.)  Petitioner contends that trial counsel was ineffective because she failed to call a firearm  expert to rebut DeMaria's testimony.  (Traverse at 11.)  Respondent correctly notes that Petitioner has failed to specify how the expert would have testified and what difference that testimony would have made in the outcome.  As such, Petitioner's showing is insufficient to support habeas relief.  Strickland, 466 U.S. at 687-88, 694.  Presumably, Petitioner would argue that if the testimony of Mr. DeMaria had been undermined by a defense expert, he would have been acquitted of the charges relating to the shooting at the Murphy residence.  Even if Petitioner had made this argument, though, it ignores other evidence that Petitioner

09cv0817

committed the shooting, including that: Petitioner was driving his van in the alley at the time gunshots were fired, Gary Murphy saw Petitioner fire two shots at his home, Petitioner knew that Kyle had his bedroom in the garage, two bullets recovered at the scene had class characteristics indicative of having been fired from Petitioner's gun, and five casings were found inside Petitioner's van and were identified as having been fired through Petitioner's gun from inside the van.

After an independent review of the record, it is clear that Petitioner has made no showing that trial counsel was objectively unreasonable for not introducing a defense firearm expert.  Thus, the California Supreme Court's denial of this claim was not contrary to, or an unreasonable application of, <u>Strickland</u>, and the claim should be denied.

### 6.   Failure to Present Sheriff's Firearms Analysis Unit Report

Petitioner contends he was rendered ineffective assistance of counsel by his trial counsel because she failed to present exculpatory evidence, namely, the Sheriff's Firearms Analysis Unit Report, at trial.  (Pet. at 9.)  Petitioner raised this aspect of his ineffective assistance of counsel claim for the first time in the California Supreme Court on collateral review.  (Lodgment No. 13 at Ground 3.)  That court denied the petition without comment.  (Lodgment No. 14.)  Because the California Supreme Court did not furnish a basis for its reasoning, this Court must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  <u>See</u> <u>Delgado</u>, 223 F.3d at 982.

Petitioner contends that the Firearms Analysis Unit Report indicates that there were no bullets found to have been shot through the Murphys' garage which positively matched Petitioner's gun, no fingerprint matches, and no evidence of gunshot residue.  (Pet. at 9; Traverse at 11.)  Petitioner argues that this was exculpatory evidence which should have been presented at trial.  In support of this argument, Petitioner attaches two documents, or excerpts of documents, to his Petition:  (1) Pages 9 and 10 of a ten-page document referred to by Petitioner as "San Diego County Sheriff's Department

Crime Laboratory Firearms Analysis Unit Report" (Pet. at 14-15)[2] and (2) Pages 1-6 of a six-page document referred to by Petitioner as "Firearms Analysis Unit Report: Trajectory Determination on Dodge Van" (Pet. at 16-21).[3]

As Respondent observes, it is difficult to understand how the reports could have helped Petitioner at trial.  Neither of the reports mentions fingerprints or gunshot residue, and the trajectory report on Petitioner's van has nothing to do with the shooting at the Murphy residence.  As to Petitioner's argument that none of the bullets found to have been shot through the Murphys' garage positively matched his gun, Criminalist DeMaria acknowledged as much during his testimony.  (RT Vol. 4 at 378-85.)  Indeed, the trial record of DeMaria's testimony shows that it was consistent with the information contained in the portion of the Firearms Analysis Unit Report supplied by Petitioner.

After an independent review of the record, it is clear that Petitioner has made no showing that trial counsel was objectively unreasonable for not introducing the Firearms Analysis Unit Report.  Thus, the California Supreme Court's denial of this claim was not contrary to, or an unreasonable application of, <u>Strickland</u>, and the claim should be denied.

### 7.   Cumulative Prejudicial Performance

Finally, Petitioner contends that his trial counsel's failure to communicate a defense strategy, withholding of evidence in the <u>Marsden</u> hearing, willful ignorance, and abandonment of any effective investigation resulted in a cumulative result of prejudicial performance.  (Pet. at 9.)  Respondent observes that this claim is unexhausted. (Answer at 21.)  Nonetheless, Respondent argues that this component of Petitioner's ineffective assistance of counsel claim should be denied notwithstanding any failure to exhaust because it clearly lacks merit.  (<u>Id.</u>)

Not only does this claim simply rehash arguments already raised by Petitioner, and thus is subsumed by the claims discussed above, but it is contradictory of a letter

---

[2]  These pages are also numbered "25" and "26" by Petitioner.

[3]  These pages are also numbered "27" through "32" by Petitioner.

09cv0817

authored by Plaintiff himself on June 6, 2005.  (Lodgment No. 1, Augment Clerk's

Transcript at 8-13.)  In a letter to the trial judge written after his trial had concluded,

Petitioner wrote:

> Your Honor, I am well pleased with the performance of Ms. Sloan Ostbye
> in my defense, and I hope that my trial in no way reflects badly upon her.  I
> feel that she has done very well with all the resources available to her.

(Id. at 12.)

Petitioner cannot state a colorable claim for ineffective assistance of counsel on

the basis of cumulative prejudicial performance.  Therefore, this aspect of Petitioner's

ineffective assistance of counsel should be dismissed.  See Cassett, 406 F.3d at 624

(federal court may deny relief on the merits of an unexhausted claim when it is perfectly

clear the petitioner has "no chance of obtaining relief").

### E.     Requests for Stay and Abeyance

Petitioner filed requests for stay and abeyance on October 29, 2009 and

November 16, 2009.  (Docs. 15, 20.)  Whether the requests are interpreted as a request

to return to state court to fully exhaust his claims or as a request for an extension of

time to file a traverse, the Court recommends the requests be denied as moot.  The

Court has issued recommendations on all unexhausted claims presented in the Petition,

notwithstanding Petitioner's failure to exhaust.  Additionally, to the extent the request

seek an extension of time to file a traverse, Petitioner eventually did file a traverse (see

Doc. 22), which the Court has considered herein notwithstanding its untimeliness.

### F.     Request for Evidentiary Hearing

Petitioner requests an evidentiary hearing.  (Pet. at 1; Traverse at 3.)  When all of

a petitioner's claims lack merit, there is no need for an evidentiary hearing.  See, e.g.,

Tanner v. McDaniel, 493 F.3d 1135, 1147 (9th Cir. 2007).  Since the Court concludes

that all of Petitioner's claims lack merit, it recommends that Petitioner's request for an

evidentiary hearing be denied.

## V.     Recommendation

After a thorough review of the record in this matter, the undersigned magistrate

09cv0817

judge finds that Petitioner has not shown that he is entitled to federal habeas relief under the applicable legal standards.  Therefore, the undersigned magistrate judge hereby recommends that the Petition be **DENIED WITH PREJUDICE** and that judgment be entered accordingly.

This Report and Recommendation is submitted to the Honorable Roger T. Benitez, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  **IT IS ORDERED** that not later than **July 19, 2010**, any party may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."  **IT IS FURTHER ORDERED** that any reply to the objections shall be served and filed not later than **August 3, 2010**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:  June 18, 2010

Jan M. Adler
U.S. Magistrate Judge